DOCKET NO. 22-10646

---

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

DYLAN CAMPBELL,

*Plaintiff-Appellant,*

v.

UNIVERSAL CITY DEVELOPMENT PARTNERS, LTD.,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 6:20-cv-00846-PGB-LHP

---

## APPELLEE, UNIVERSAL CITY DEVELOPMENT PARTNERS, LTD.'S,
## ANSWERING BRIEF

---

Michael J. Beaudine, Esq.
Florida Bar No. 0772763
beaudine@lathamluna.com
LATHAM, LUNA, EDEN & BEAUDINE, LLP
201 S. Orange Avenue, Suite 1400
Orlando, Florida 32801
Telephone: 407-481-5800

David Raizman, Esq.
California Bar No. 129407
david.raizman@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800

*Attorneys for Defendant-Appellee, Universal City Development Partners, Ltd.*

DOCKET NO. 22-10646

*Dylan Campbell v. Universal City Development Partners, Ltd.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellee, UNIVERSAL CITY DEVELOPMENT PARTNERS, LTD., d/b/a VOLCANO BAY, pursuant to Rule 26.1, Federal Rules of Appellate Procedure, and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, hereby provides the following list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1. Beaudine, Michael J. – Counsel for Appellee

2. Byron, Paul G. – United States District Judge

3. Campbell, Dylan – Appellant

4. Comcast Corporation (ticker: CMCSA)

5. Dietz, Matthew W. – Counsel for Appellant

6. Disability Independence Group, Inc. – Counsel for Appellant

7. Hoffman, Leslie R. – United States Magistrate Judge

8. Latham, Luna, Eden & Beaudine, LLP – Counsel for Appellee

9. NBCUniversal Media, LLC

10. Ogletree, Deakins, Nash, Smoak & Stewart, P.C. – Co-Counsel for

DOCKET NO. 22-10646

*Dylan Campbell v. Universal City Development Partners, Ltd.*

Appellee

      11.    Raizman, David – Co-Counsel for Appellee

      12.    Taylor, Christina – Co-Counsel for Appellee

      13.    Universal City Development Partners, Ltd., d/b/a Volcano Bay –

Appellee

      14.    Universal City Florida Holding Co. I

      15.    Universal City Florida Holding Co. II

## STATEMENT REGARDING ORAL ARGUMENT

Appellee, Universal City Development Partners, Ltd., respectfully seeks oral argument in this case in the hope that it may assist the decisional process.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ....................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS........................................................................... ii

TABLE OF CITATIONS ......................................................................... iv

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF ISSUES .......................................................................1

STATEMENT OF THE CASE...................................................................2

    Course of Proceedings and Disposition Below ...............................................2

    Statement of the Facts....................................................................................3

    Standard of Review........................................................................................8

SUMMARY OF THE ARGUMENT ........................................................9

ARGUMENT ..........................................................................................11

    I.    THE DISTRICT COURT CORRECTLY HELD THAT IT WAS
    "NECESSARY" TO UNIVERSAL'S OPERATION OF VOLCANO
    BAY TO FOLLOW THE MANUFACTURER'S RIDER
    ELIGIBILITY REQUIREMENTS. ....................................................11

        A.    Compliance with Florida State Law Is Quite Literally
        "Necessary" to the Operation of Volcano Bay. ........................13

B.    It Is also "Necessary" for both Florida and Universal to Rely on the Superior Ride Safety Expertise and Experience of the Manufacturers. ..........................................................................23

C.    Florida's Creation of a *Uniform* System for Ensuring Amusement Ride Safety, Including the Ride Eligibility Requirements at Issue Here, Is Likewise "Necessary" to Public Safety..........................................................................................26

II.    THE DISTRICT COURT PROPERLY FOUND THAT THE ADA DOES NOT PREEMPT FLORIDA LAW THAT MANDATES AMUSEMENT RIDE SAFETY STANDARDS. ...............................34

CONCLUSION ......................................................................................46

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS....................47

CERTIFICATE OF SERVICE ..............................................................48

## <u>TABLE OF CITATIONS</u>

### <u>Cases</u>

*Bailey v. Bd. of Comm'rs of La. Stadium & Exposition Dist.*, 484 F. Supp. 3d 346
  (E.D. La. 2020) ....................................................31

*Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222 (10th Cir. 2009) ......................44

*Baughmann v. Walt Disney World Co.*, 685 F.3d 1131 (9th Cir. 2012)..................28

*Bench v. Six Flags Over Texas, Inc.*, 3:13-CV-705-P , 2014 WL 12586743
  (N.D. Tex. July 7, 2014) .......................................................... 29, 31, 33

*Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460 (D.N.J. 1998)..........31

*Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846 (6th Cir. 1998)..........................19

*Castelan v. Universal Studios Inc.*, No. CV 12-05481 BRO (AGRx),
  |2014 WL 210754 (C.D. Cal. Jan. 10, 2014) ..................................... 23, 28, 29, 30

*Chamber of Com. v. Whiting*, 563 U.S. 582 (2011)......................................... 35, 45

*Cole v. Nat'l Collegiate Athletic Ass'n*, 120 F. Supp. 2d 1060 (N.D. Ga. 2000).....17

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)...............................38

*Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996)..............................................44

*Ellis v. England*, 432 F.3d 1321 (11th Cir. 2005)....................................................8

*Emerson v. Thiel Coll.*, 296 F.3d 184 (3d Cir. 2002) .............................................31

*Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125 (11th Cir. 2020) ...............39

*Ganden v. Nat'l Collegiate Athletic Ass'n*, No. 96 C 6953, 1996 WL 680000

(N.D. Ill. Nov. 21, 1996)......................................................................17

*Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017)......... 35, 36

*Guckenberger v. Bos. Univ.*, 974 F. Supp. 106 (D. Mass. 1997) ...........................17

*Herriot v. Channing House*, No. C 06-6323 JF (RS), 2009 WL 225418
   (N.D. Cal. Jan. 29, 2009) ............................................................... 19, 27

*Howarth v. City of De Land*, 117 Fla. 692, 158 So. 294 (1934)..............................46

*J.A.M. v. Nova Se. Univ., Inc.*, 646 F. App'x 921 (11th Cir. 2016) .........................17

*Leiken v. Squaw Valley Ski Corp.*, No. 1994 WL 494298
   (E.D. Cal. June 28, 1994)......................................................................28

*Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837 (9th Cir. 2004)...............................31

*Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084 (11th Cir. 2021)............ 35, 38, 41

*Marsh v. Rosenbloom*, 499 F.3d 165 (2d Cir. 2007) ........................................ 38, 40

*Masci v. Six Flags Theme Parks, Inc.*, Civil Action No. 12-6585,
   2014 WL 7409952 (D.N.J. Dec. 31, 2014)............................................ 29, 31, 32

*Matheis v. CSL Plasma, Inc.*, 936 F.3d 171 (3d Cir. 2019).............................. 27, 28

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ................................................. 35, 36

*Mullen v. S. Denver Rehab., LLC*, Civil Action No. 18-cv-01552-MEH,
   2020 WL 2557501 (D. Colo. May 20, 2020) .......................................................31

*Murphy v. United Parcel Serv., Inc.*, 946 F. Supp. 872 (D. Kan. 1996) .................19

*Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063 (5th Cir. 1995) ...............................30

*Parise v. Delta Airlines, Inc.*, 141 F.3d 1463 (11th Cir. 1998) ..............................36

*Peck v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 996 F.3d 224 (4th Cir. 2021) .... 16, 17

*Pruett v. Arizona*, 606 F. Supp. 2d 1065 (D. Az. 2009) .........................................19

*Quinones v. City of Evanston*, 58 F.3d 275 (7th Cir. 1995) ...................... 20, 21, 23

*Rose v. Springfield-Greene Cnty. Health Dep't.*, 668 F. Supp. 2d 1206 (W.D. Mo. 2009)................................................................................................18

*Rozar v. Mullis*, 85 F.3d 556 (11th Cir. 1996).........................................................8

*Tatum v. Nat'l Collegiate Athletic Ass'n*, 992 F. Supp. 1114 (E.D. Mo. 1998)......31

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................................ 35, 38

*Young v. City of Claremore, Okla.*, 411 F. Supp. 2d 1295 (N.D. Okla. 2005) ...................................................................................... 19, 27

## Statutes

42 U.S.C. § 12101 ...................................................................................................39

42 U.S.C. § 12183 ...................................................................................................19

Fla. Stat. § 616.242 ...................................................................................... passim

## Other Authorities

Fla. Admin. Code R. 5J-18.0011 .............................................................................14

Fla. Admin. Code R. 5J-18.016 ......................................................... 14, 15, 37, 39

U.S. Dep't of Justice, *Guidance on [Title III] ADA Regul. on Nondiscrimination [etc.]*, 56 Fed. Reg. 35544 (July 26, 1991)............................................................22

U.S. Dep't of Justice, *Tech. Assistance Manual* ................................... 20, 22, 28, 34

## PRELIMINARY STATEMENT

In this Brief, Appellant, Dylan Campbell, is referred to as "Campbell." Appellee, Universal City Development Partners, Ltd., is referred to as "Universal." *Amicus Curiae*, the United States Department of Justice, is referred to as the "DOJ." The United States District Court for the Middle District of Florida, Orlando Division, is referred to as the "District Court."

References to documents filed with the District Court are denoted by docket number and page number as follows: "Doc. No. ## at p. #." References to Campbell's Initial Brief filed on June 2, 2022 (the "Initial Brief"), are denoted "I.B. at p. #," while references to the DOJ's Brief filed on June 9, 2022, are denoted "DOJ at p. #."

## STATEMENT OF ISSUES

1.      Whether Universal's compliance with manufacturer ride safety requirements, made mandatory by Florida's comprehensive amusement park safety scheme, is "necessary" to Universal's operation of the Volcano Bay amusement park.

2.      Whether, despite Congress expressly contemplating the legitimacy of safety standards and the states' historic police powers, the Americans with Disabilities Act preempts Florida's comprehensive amusement park safety scheme.

1

## STATEMENT OF THE CASE

### Course of Proceedings and Disposition Below

This is an appeal of an Order entered by the District Court granting summary judgment, and the ensuing entry of final judgment, each in favor of Universal and against Campbell on all claims.

On May 18, 2020, Campbell filed the Complaint in the action below, claiming a violation of the Florida Civil Rights Act ("FCRA") and of Title III of the Americans with Disabilities Act ("ADA"). (Doc. No. 1.) Although it seeks damages that are unavailable under the ADA, Campbell's FCRA claim is otherwise based on the same factual and legal contentions as his ADA claim. (*Id.*)

On October 21, 2021, the parties filed crossing motions for summary judgment (Doc. Nos. 29 & 30), based in large part on a shared Stipulation of Agreed Material Facts (Doc. No. 28). On February 7, 2022, the District Court entered its Order denying Campbell's motion and granting Universal's motion. (Doc. No. 66.) The District Court held that Universal's enforcement of ProSlide's ride requirements was "necessary" to the safe operation of Volcano Bay within the meaning of 42 U.S.C. § 12182(b)(2)(A)(i). (*Id.* at pp. 9-10.) The District Court further held that the ADA did not preempt Florida's statutory amusement park safety system because, in passing the ADA, "[t]here is no evidence … that Congress meant to oust the Florida Legislature from the entire legislative field…. To the contrary, Congress

2

expressly anticipated the need for and exempted necessary eligibility criteria,…
[T]he Florida regulations fit within the federal statutory scheme by using the state's
historic police powers to institute a 'floor' of neutral ridership eligibility criteria that
the Florida Legislature deems necessary for the safe operation of amusement rides."
(*Id.* at p. 8.)

This appeal followed on February 25, 2022.  (Doc. No. 69.)

## **Statement of the Facts**

The facts underlying this appeal are largely undisputed.  Campbell does not
have a right forearm and hand, and he does not use a prosthetic.  (*See* Doc. No. 28
at p. 1.)  A self-professed, life-long athlete, who made his high school varsity
basketball team (and still plays) (Doc. No. 1 at p. 2.), Campbell claims that he needs
no accommodations at work or in any of his daily activities and can safely ride all
of the attractions at the Volcano Bay water amusement park ("Volcano Bay") that
Universal has operated since May 2017.  (*Id.* at pp. 2, 5; Doc. No. 28 at pp. 1-2.)
Non-party ProSlide Technology, Inc. ("ProSlide"), an entity organized under the
laws of Ontario, Canada, designed and manufactured the vast majority of rides at
Volcano Bay, including all of the rides or attractions that are at issue in this action.
(*Id.* at p. 2.)  Pursuant to Florida law, as manufacturer, ProSlide, the recognized
leader in water ride design, also developed and authored all of the rider restrictions
at Volcano Bay of which Campbell complained below.  (*Id.* at pp. 3-5, 7-8; Doc. No.

39-1 at pp. 3-4.)   ProSlide employs as part of its product development team mechanical engineers, composite engineers, structural engineers and electrical engineers, who collectively use calculations and mathematical models to explain and predict the ride phenomena.   (*Id.* at p. 3.)   ProSlide, including many of its key personnel, has 35 years of experience in designing and building water rides (Doc. No. 28 at pp. 8-9) and relies on empirical evidence acquired by observation and experimentation from those years.   (Doc. No. 39-1 at p. 3.)   This documentation of patterns and behaviors includes "thousands of ride verifications performed by ProSlide."   (*Id.*)   Indeed, the one testifying witness on ProSlide's behalf has alone "personally participated and experienced an overwhelmingly majority of [its] waterslides, and its various functions and components," and has "been exposed to thousands of different gradients; turns; and water flows that create acceleration and deceleration on waterslides."   (*Id.* at p. 4.)   In addition to relying on that experience, ProSlide says it relied on "industry accepted riding parameters" in developing the rider eligibility requirements for Volcano Bay.   (Doc. No. 28 at pp. 8-9.)

During a visit to Volcano Bay in May 2019, a Universal ride operator told Campbell that he was unable to ride the "Krakatau" attraction, built by ProSlide, because he could not meet ProSlide's ride restrictions, which require that riders be able to hold, with two hands, the handles provided to riders.   (*Id.* at pp. 2, 3-5.) Despite his inability to grasp both handles, Campbell asserts that he can maintain an

appropriate position throughout the Krakatau ride and on all of the other rides (or slides) at Volcano Bay.  (*Id.* at p. 1.)

At the time of Campbell's May 2019 visit, the rider eligibility requirements were recorded in Universal's Volcano Bay Riders' Guide (the "Riders' Guide"). (Doc. No. 28-1; Doc. No. 28 at p. 2.)  While the Riders' Guide is, strictly speaking, a Universal creation, it is the direct product of, and must faithfully follow, the requirements set forth in the manufacturer's Operations Manuals.  (Doc. No. 30-1 at pp. 6-7, 8; *see*, *e.g.*, *id.* at p. 8 [¶ 41] ("ASTM F770-18 § 5 requires that Universal must accurately translate operating and maintenance instructions into the derivation of its ridership policies.") and at p. 8 ("ASTM F770-18 § 5 requires Universal to incorporate ProSlide's recommendations in preparation of policies and procedures to operate their rides safely and in preparation of its [Riders' Guide].").)

The basis for the Riders' Guide was derived from hazard analyses and risk assessments performed by ProSlide and its ride safety consultant, RAMS.  (Doc. No. 28 at p. 3.)  ProSlide's analysis and rider eligibility standards were then captured in the Operations Manuals it created for each of its Volcano Bay attractions.  (*Id.*; Doc. No. 30-1 at p. 8.)  Each of the Operations Manuals contains requirements that would bar Campbell from riding the rides and slides at issue.  (Doc. No. 30-1 at p. 6.)

After reviewing ProSlide's Operations Manuals, Universal created the first version of the Rider Eligibility Chart for persons who may have a limb difference

("Rider Eligibility Chart"), a true and correct copy of which is attached as Exhibit 12 to the Stipulation.[1] (Doc. No. 28 at p. 4.) On December 13, 2016, several months before Volcano Bay opened, Universal provided its *proposed* Rider Eligibility Chart (Doc. No. 28-12) for approval to ProSlide. (Doc. No. 28 at p. 4.) Although ProSlide rejected Universal's proposed Rider Eligibility Chart, Universal's initial version of the Chart would have permitted Campbell to enjoy all of the Volcano Bay rides, provided that he could maintain the proper riding position on all of the rides. (*Id.*) ProSlide and Universal discussed these ridership eligibility requirements many times over the subsequent five months, with Universal repeatedly pressing for the loosening of rider requirements that would have allowed Campbell to ride all of the Volcano Bay rides. (Doc. No. 28 at p. 4; Doc. No. 28-13.)

In late April 2017, just before Volcano Bay opened, ProSlide rejected Universal's final, proposed Rider Eligibility Chart that would have relaxed the standards in the Operations Manuals in a manner that would have permitted Campbell to ride all of the Volcano Bay attractions and instead insisted on a Rider Eligibility Chart that retained all of the stricter rider eligibility standards in the

---

[1]      The Rider Eligibility Chart has nine different rows, each devoted to a different ride or attraction, and each row intersects thirteen different columns representing individuals with thirteen kinds of limb differences. The ridership eligibility requirements applicable to Campbell are found in Column 3 of the Rider Eligibility Chart, namely, those for individuals with one natural arm. (Doc. No. 28 at pp. 5-6.)

Operations Manuals, which barred Campbell's ridership of the Volcano Bay rides and slides at issue.  (Doc. No. 28 at p. 5; Doc. No. 28-14.)

As required by ASTM (*see* Argument Section I., *infra*), Universal took ProSlide's approved version of the Rider Eligibility Chart (Doc. No. 28-14) and created the Riders' Guide (Doc. No. 28-1), which contains the rider eligibility requirements for the Volcano Bay attractions that were in effect at the time of Campbell's May 2019 visit to Volcano Bay.  (Doc. No. 28 at p. 2.)

Particularly relevant to this appeal is the entirely undisputed and unrebutted testimony of Universal's expert below, Brian D. King, P.E., a mechanical engineer with over 34 years specializing in amusement ride safety, and more pertinent to this action, 30 years of experience working closely with the ASTM F24 Committee for Amusement Rides and Devices, the Committee of the international standards organization that develops and publishes technical standards for the amusement park industry, many of which have the force of law by virtue of their adoption by the State of Florida and the majority of other states.  (Doc. No. 30-1 at pp. 1, 7-8.)  Mr. King's report demonstrated, among other things, that ASTM requires that: (1) ride operators like Universal must follow manufacturer's requirements in developing the ridership eligibility requirements that Campbell challenges here; (2) all stakeholders in Florida's amusement park industry understand that Florida law requires amusement parks to follow ASTM; and (3) pursuant to that understanding, Universal submits

annual certifications each year to the State of Florida that it complies with applicable Florida statutes and regulations, which require compliance with ASTM. (*Id.* at p. 8; Doc. Nos. 31, 31-1, 31-2, 31-3, 31-4, and 31-5.)

Finally, Volcano Bay's Assistant Director − Operations, Bob Sharpe, attested to a variety of non-controversial facts, including the thousands of daily visitors, and hundreds of thousands of annual visitors, to Volcano Bay and the sheer impossibility of independently assessing the abilities of each guest, or even each disabled guest, to determine whether the manufacturer's ride requirements could be modified for that guest's particular abilities or disabilities. (Doc. No. 32 at p. 3.) There is no dispute, as noted above, that in excluding Campbell from certain attractions at Volcano Bay, Universal was faithfully adhering to Florida law and the ASTM Standards made mandatory by that law. (Doc. No. 30-1 at p. 8; Doc. Nos. 31, 31-1, 31-2, 31-3, 31-4, and 31-5.)

## **Standard of Review**

This Court conducts *de novo* review of an order granting summary judgment. *Ellis v. England*, 432 F.3d 1321, 1324 (11th Cir. 2005). With *de novo* review, this Court "may affirm a grant of summary judgment on any alternative ground fairly supported by the record." *Rozar v. Mullis*, 85 F.3d 556, 564 (11th Cir. 1996).

8

## SUMMARY OF THE ARGUMENT

Dylan Campbell sued Universal for being denied ridership at the Volcano Bay water park in Orlando because the manufacturer's rider safety requirements barred Campbell from riding because he was unable to grasp handles with two hands. Florida law requires Universal to comply with certain ASTM Standards, which, in turn, compel a ride operator's conformance to the manufacturer's rider safety requirements.

These undisputed facts make it clear that it was "necessary" within the meaning of 42 U.S.C. § 12182(b)(2)(A)(i) for multiple reasons for Universal to impose the manufacturer's (ProSlide's here) "eligibility criteria" that excluded Campbell from certain rides. <u>First</u>, Universal quite literally could not lawfully operate Volcano Bay, under force of a valid Florida law that manifests a clear exercise of the states' police powers, without imposing ProSlide's rider eligibility rules. Fla. Stat. § 616.242(4)(c); 42 U.S.C. § 12182(b)(2)(A)(i) (permitting exclusive "eligibility criteria" where "necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered"). That plainly distinguishes this case from those that Campbell (or the DOJ) cited where the state or local law in question plainly violates federal law and does not fall within an area expressly reserved for the states. (*See* Argument Section I.A, *infra*.)

9

Second, as properly determined by the State of Florida in the exercise of its police powers, it is also "necessary" for Universal (and other operators of amusement rides) to rely on the superior ride safety expertise and experience of the manufacturers for the rides they develop and create, often in multiple locations. (*See* Argument Section I.B, *infra*.)   Third, Florida's creation of a *uniform* system for ensuring amusement ride safety, including the rider eligibility requirements at issue here, is likewise "necessary" for public safety, as opposed to a system advocated by Campbell (and the DOJ) that would make manufacturers' requirements subject to challenge and revision by multiple amusement park operators and literally any of millions of park visitors.  In the interest of public safety, Florida quite sensibly, like a majority of the states, has relied on the ASTM Standards to create a uniform system of ride safety safeguards, including rider eligibility requirements.  (*See* Argument Section I.C, *infra*.)

Indeed, before the District Court below joined the majority rule with the grant of summary judgment challenged here, two of the three federal courts that have addressed cases on all fours have agreed that ride operators do not violate Title III of the ADA ("Title III") when they comply with state law rider safety mandates that require operators to follow manufacturers' guidelines.  The third case is distinguishable on its facts and procedural context and would likely be decided

10

differently based on the instant facts and circumstances. (*See* Argument Section I.D, *infra*.)

Finally, Campbell's contention that the ADA preempts Florida's statutory scheme is misguided and simply wrong. In exercising its traditional police powers for the protection of public safety, the State of Florida chose to rely on ASTM Standards and manufacturer requirements for amusement rides. Applicable Florida law here does not stand as an obstacle to accomplishing the legislative purposes of the ADA. Indeed, in passing the ADA, Congress expressly contemplated that the states could lawfully maintain safety requirements that may exclude certain persons with disabilities and expressly used amusement park safety standards as an example of such a lawful requirement. Thus, as the District Court found, Florida law is fully consistent, and not in conflict, with the ADA. Campbell failed to meet the "high threshold" required to demonstrate that the ADA preempts Florida's exercise of its historic police powers. (*See* Argument Section II, *infra*.)

For these reasons, set forth more fully below, summary judgment for Universal should be affirmed.

## <u>ARGUMENT</u>

## I.    <u>THE DISTRICT COURT CORRECTLY HELD THAT IT WAS "NECESSARY" TO UNIVERSAL'S OPERATION OF VOLCANO BAY TO FOLLOW THE MANUFACTURER'S RIDER ELIGIBILITY REQUIREMENTS.</u>

In making discriminatory "eligibility criteria that screen out … an individual

11

with a disability," Congress notably exempted those criteria that are "necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered." 42 U.S.C. § 12182(b)(2)(A)(i). As demonstrated below, the rider eligibility requirements at issue here were plainly "necessary" because (1) Universal quite literally could not lawfully operate Volcano Bay without complying with a valid and comprehensive safety scheme mandated by Florida law in the traditional exercise of the police powers reserved for the state; (2) as properly determined by the State of Florida in the exercise of its police powers, it is also "necessary" for Universal (and other operators of amusement rides) to rely on the superior ride safety expertise and experience of the manufacturers for the rides they develop and create, often in multiple locations; and (3) Florida's creation of a *uniform* system for ensuring amusement ride safety, including the rider eligibility requirements at issue here, is likewise "necessary" for public safety, as opposed to a system advocated by Campbell (and the DOJ) that would make manufacturers' requirements subject to challenge and revision by multiple amusement park operators and literally any of millions of park visitors.[2]

---

[2]    Campbell and the DOJ mischaracterize, and unduly limit and distort, Universal's "necessary" defense as a safety-based determination. (*See*, *e.g.*, I.B. at pp. 1, 19 ("A public accommodation may impose legitimate safety requirements that are necessary for safe operation."); DOJ at p. 20 ("In other ADA cases where a defendant invokes a safety-related defense….").) While Universal certainly makes and embraces certain safety-based defenses, its "necessary" defenses are not

**A.** **Compliance with Florida State Law Is Quite Literally "Necessary" to the Operation of Volcano Bay.**

    **1.** **Florida Law Requires Universal's Compliance with ASTM, Which, in Turn, Requires Compliance with the Ride Manufacturer's Safety Requirements.**

Florida law mandates that amusement park operators in the state must comply with ASTM. In 1998, the Florida Legislature substantially amended Section 616.242, *Florida Statutes*, entitled "Safety Standards for Amusement Rides." Section 616.242(1) provides that "[t]he owner and the manager of an amusement ride, and each amusement ride, must meet at all times the requirements of this section and any rules adopted hereunder." [3] In Section 616.242(4)(a)1., the Legislature

---

restricted to a defense of the ProSlide rider requirements. Rather, as described more fully below in this section, they are primarily grounded in its required obedience to a valid Florida regulatory scheme created in the state's traditional exercise of its historic police powers, a regulatory scheme expressly contemplated by Congress in passing the ADA and this very provision.

    Nearly all of the cases cited by both Campbell and the DOJ are distinguishable in that they involve "necessary" defenses based exclusively on safety determinations and are also safety determinations made by the defendant itself, and not an independent public health authority. Also irrelevant to this analysis are the cases cited by Campbell that were decided under the "direct threat" defense (42 U.S.C. § 12182(b)(3)), which the District Court did not rely on in its ruling and which Universal does not press on appeal.

[3]    While Section 616.242 technically exempts from its coverage Volcano Bay (and other "[p]ermanent facilities that employ at least 1,000 full-time employees and that maintain full-time, in-house safety inspectors"), Volcano Bay is still covered by Section 616.242 because exempt entities "must file an affidavit of the annual inspection with the department on a form prescribed by department rule." Fla. Stat.

directed the Florida Department of Agriculture and Consumer Services (the "Department") to "adopt by rule standards for amusement rides which are the same as or similar to the following national standards: … ASTM International Committee F24 Standards on Amusement Rides and Devices. …" (the "ASTM Standards").

Accordingly, the Department adopted Rule 5J-18.0011, *Florida Administrative Code* ("*F.A.C.*"), which in turn expressly adopted ASTM Standards F747-15, F770-18, F1193-18, F2291-18, and F2376-17a (among other ASTM Standards).[4]  It is undisputed that the ASTM Standards, in turn, require amusement park operators to follow the manufacturer's requirements in the various manuals, including the rider eligibility requirements.  (Doc. No. 30-1 at pp. 5-8.)

The Department also adopted Rule 5J-18.016, *F.A.C.*, entitled "Regulation of Water Parks," that established "specific requirements for water related amusement rides in addition to the general requirements contained in this chapter in order that water related amusement rides erected permanently or temporarily in the state are operated and maintained in accordance with Section 616.242, F.S."  Fla. Admin. Code R. 5J-18.016(1).  Consistent with the applicable ASTM Standards, Rule 5J-

---

§ 616.242(11)(a)(1).  That affidavit requires the operator to certify that "all of the amusement rides listed are in general conformance with the requirements of Section 616.242(4)(a), *Florida Statutes*, and Rule 5J-8.0011, Florida Administrative Code." (*See* Doc. No. 30-1 at p. 8; Doc. Nos. 31, 31-1, 31-2, 31-3, 31-4, and 31-5.)

[4]    *All* of the Volcano Bay rides in question are covered by ASTM F770, F2376, and F1193, and Krakatau is *also* covered by ATSM F2291.  (Doc. No. 30-1 at p. 6.)

18.016(6) requires an owner to "operate each water related amusement ride in accordance with its operations manual and manufacturer requirements." Fla. Admin. Code R. 5J-18.016(6)(a). In addition, "[o]wners, managers or attendants shall enforce the rules for patron safety set out in the owner's operations manual and in manufacturer's requirements." Fla. Admin. Code R. 5J-18.016(6)(e).

As noted above, Section 616.242 requires the annual affidavit of compliance with Florida law, including its adoption of ASTM, a certification that Universal has made and submitted on an annual basis. (Doc. Nos. 31, 31-1, 31-2, 31-3, 31-4, and 31-5.)

>    **2.    It Is "Necessary" in Every Sense of the Word for Universal to Follow Florida's Mandate to Comply with ASTM Standards.**

The ridership eligibility requirements imposed by ProSlide, and thus mandated by ASTM and Florida law, are, by definition, "necessary" for Universal's lawful operation of Volcano Bay. Put another way, Universal's adherence to those requirements is a "necessary" condition to the State of Florida's permitting Universal to operate its rides. Moreover, the eligibility criteria mandating certain physical characteristics are directly analogous to the height requirements for amusement park rides that the DOJ expressly blessed in its Preamble to the Title III regulations. These DOJ-blessed height requirements are found in the *same Operations Manuals* that for some rides required that Campbell be able to grasp with

15

two hands in order to maintain proper riding position. (Doc. No. 32 at pp. 2-3.) Just as Universal imposes the height requirement provided by the manufacturer (and blessed by the DOJ), it likewise must enforce the manufacturer's other physical requirements for safe ridership.

Notwithstanding Campbell's (and the DOJ's) attempt to limit the "necessary" defense to safety requirements, nothing in the language of the "eligibility criteria" provision even remotely suggests such a narrow application of the statute. 42 U.S.C. § 12182(b)(2)(A)(i). Indeed, such a narrow reading would render the "necessary" defense as surplusage in light of Congress' provision of the direct threat defense just a few sub-provisions later. 42 U.S.C. § 12182(b)(3) ("Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others.").

Further, it is elementary that acts of Congress should be interpreted to give meaning to each provision, particularly within a single statutory provision. "It is well-established that '[w]here Congress has utilized distinct terms within the same statute, the applicable canons of statutory construction require that we endeavor to give different meanings to those different terms.'" *Peck v. U.S. Dep't of Lab., Admin. Rev. Bd.*, 996 F.3d 224, 231 (4th Cir. 2021) (quoting *Soliman v. Gonzales*, 419 F.3d 276, 283 (4th Cir. 2005)). "This different-terms canon is grounded in the

16

understanding that Congress acts deliberately—'where Congress includes particular language in one section of a statute but omits it in another provision of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.'" *Id.*

Consistent with the different-terms canon, this Court has joined others in upholding, or at least favorably discussing, the "necessary" defense as existing outside of any safety-based reason for the necessity. *J.A.M. v. Nova Se. Univ., Inc.*, 646 F. App'x 921, 925 (11th Cir. 2016) (finding that a university's alcohol-related conditions placed on a medical student with alcohol problems were "necessary to facilitate the successful completion of his coursework"); *see also Cole v. Nat'l Collegiate Athletic Ass'n*, 120 F. Supp. 2d 1060, 1070-71 (N.D. Ga. 2000) ("Eligibility requirements are deemed 'essential' or 'necessary' when such requirements are reasonably necessary to accomplish the purposes of a particular program … NCAA's minimum academic scores … are an essential eligibility requirement."); *Guckenberger v. Bos. Univ.*, 974 F. Supp. 106, 140 (D. Mass. 1997) (finding that "in regard to ADD/ADHD, a doctorate level of training is 'necessary' within the meaning of the federal law" for proper evaluation and documentation of such learning disabilities); *Ganden v. Nat'l Collegiate Athletic Ass'n*, No. 96 C 6953, 1996 WL 680000, at *17 (N.D. Ill. Nov. 21, 1996) (finding that the NCAA's "core course" definition and minimum GPA requirements were "necessary" eligibility

criteria).

Thus, independent of any safety-based "necessity," Florida's regulatory scheme for amusement parks makes it "necessary" for Universal to operate Volcano Bay consistent with those regulations, including strict adherence to ASTM and the rider eligibility requirements imposed by the manufacturer.  To honor Campbell's request to modify the requirements would place Universal at odds with Florida law, subjecting it to closure and to criminal and civil penalties.  Fla. Stat. § 616.242(21)(a) (authorizing suspension, denial, and revocation of license to operate and daily administrative fines).  Under such circumstances, it is quite literally "necessary" for Universal to operate Volcano Bay consistent with ProSlide's requirements, whatever their subjective merits.  To closely paraphrase the statute, Florida law makes Universal's adherence to ProSlide's rider eligibility criteria "necessary to the provision of the goods, services, [etc.] being offered" at Volcano Bay.  42 U.S.C. § 12182(b)(2)(A)(i).  Any disregard of such criteria would entail the unlawful provision of the rides offered.

Federal courts addressing analogous quandaries have repeatedly held that the ADA does not require a place of public accommodation to accommodate an individual's disability by ignoring other duties imposed by law.  *See Rose v. Springfield-Greene Cnty. Health Dep't.*, 668 F. Supp. 2d 1206, 1216 (W.D. Mo. 2009) (defendants cannot be made to violate other laws to provide access to disabled

18

woman seeking to use monkey as service animal); *Murphy v. United Parcel Service, Inc.*, 946 F. Supp. 872, 883 (D. Kan. 1996); *Young v. City of Claremore, Okla.*, 411 F. Supp. 2d 1295, 1310 (N.D. Okla. 2005); *Herriot v. Channing House*, No. C 06-6323 JF (RS), 2009 WL 225418, at *4 (N.D. Cal. Jan. 29, 2009); *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998) (affirming dismissal and holding that the defendant would have run afoul of state law and subjected itself to the risk of other legal liabilities had it provided the accommodation sought by the plaintiff); *see also Pruett v. Arizona*, 606 F. Supp. 2d 1065, 1078-80 (D. Az. 2009) (modification of Arizona's wildlife regulations restricting domestic ownership of chimpanzees to allow plaintiff use of chimpanzee as an ADA "service animal" is not a "reasonable" modification of existing wildlife laws).  The Sixth Circuit concisely described the inherent unreasonableness in requiring a modification that violates existing law:

> To allow a finder of fact to ignore the . . . requirement set forth in [state] law would force a Hobson's choice on the Board, leaving the Board either to subject itself to potential ADA liability … or to subject itself to potential penalties from the state for failing to adhere to state law, to say nothing of the possible tort liability.

*Brickers*, 145 F.3d at 850.  This is the precise, unreasonable choice that Campbell asks this Court to impose on Universal and that this Court must reject.

Even when meeting the much higher threshold for prevailing on the "direct threat" defense under 42 U.S.C. § 12183(b)(3), the DOJ has recognized the propriety

of relying on public health authorities for establishing broad standards to protect public health and safety. *See* U.S. Dep't of Justice, *Tech. Assistance Manual* § III.3.8000 ("Making this [direct threat] assessment will not usually require the services of a physician. Sources for medical knowledge *include public health authorities*….") (emphasis added)). If public health authorities are proper sources for establishing the "direct threat" defense, the State of Florida must be in a position to establish the standards for creating a system by which rider eligibility requirements are established. For all these reasons, it is indeed "necessary" and proper for Universal to follow the mandate of Florida law and, in turn, follow the directions of the ride manufacturers.

The DOJ's citation to the easily-distinguishable decision in *Quinones v. City of Evanston*, 58 F.3d 275 (7th Cir. 1995), for the proposition that "[a] discriminatory state law is not a *defense* to liability under federal law; it is a *source* of liability under federal law," does nothing to undermine Universal's "necessary" defense. In *Quinones*, the plaintiff, a 39-year old medic, was hired on by the municipal fire department despite express Illinois and Age Discrimination in Employment Act ("ADEA") exemptions that permitted the municipality to lawfully decline to hire individuals age 35 and over. *Id.* at 276-77. Having been hired, the plaintiff challenged as a plain violation of ADEA's "equal pay" requirements the municipality's withholding of a pension entitlement available to other department

employees, pursuant to an Illinois law that barred provision of a pension to anyone starting after the age of 35. *Id.* The municipality conceded that the withholding of a pension violated the ADEA's "equal pay" requirements but claimed, as here, that it could not violate Illinois law that prohibited it from providing a pension to the ADEA plaintiff. *Id.*

Despite passing similarities with the circumstances of this appeal, the differences are striking and relevant. First, and perhaps most critically, in *Quinones*, the violation of the ADEA in depriving a pension to an over-34 employee was both *plain and undisputed* by all parties. In the words of the court, "Evanston has been told by the State of Illinois that it may not provide pensions to firefighters hired after age 34; it has been told by the United States of America to treat these employees no worse than those hired when younger." *Id.* at 277. The directive of the United States in the ADEA was unqualified and clear. Not so here for multiple reasons. Campbell's ADA claim here is neither plain nor undisputed. Among other things, unlike the ADEA and the total absence of any excuse under that law for depriving the pension, the ADA provision in question provides for an express defense for "necessary" compliance with state laws, and expressly contemplated the need for amusement park safety regulations. U.S. Dep't of Justice, *Guidance on [Title III] ADA Regul. on Nondiscrimination [etc.]*, 56 Fed. Reg. 35544, 35564 (July 26, 1991)

21

(codified at 28 C.F.R. pt. 36, App. C, § 36.301(b) at 223; U.S. Dep't of Justice, ADA *Tech. Assistance Manual*, § III-4.1200.

Thus, applying the logic in *Quinones* to these far different circumstances, while Florida is telling Universal that it must implement the manufacturers' ride restrictions, the United States is telling Universal that it may well not have to follow those ride restrictions. Even the DOJ concedes that the outcome of the review they seek on remand may result in the upholding of the ride requirements. (DOJ at pp. 18-19 ("To be sure, this Court need not hold that the ADA in fact preempts the Florida law and regulations at issue here.").)

Moreover, unlike the municipality in *Quinones*, Universal had no reason to believe that ProSlide, which has vast experience in the manufacturing of water rides and a deep bench of technical experts (Doc. No. 28 at pp. 8-9; Doc. No. 39-1 at pp. 3-4), and which was required by Florida's adoption of ASTM Standards to develop ride safety standards, had failed to meet those obligations. While the municipality in *Quinones* was openly and plainly violating express and unambiguous ADEA provisions, preventing it from relying on a contradictory state law, Universal was not only acting in conformance with the expectation of amusement ride safety standards by the ADA's drafters, but the circumstances of ProSlide's water park expertise gave Universal every reason to believe that ProSlide had done everything

22

required by ASTM Standards to test and derive reasonable ride requirements.[5]

As a result, it was quite literally "necessary" for Universal to comply with Florida law compelling adherence to the manufacturer's rider requirements in order to continue to operate Volcano Bay.

### B. It Is also "Necessary" for both Florida and Universal to Rely on the Superior Ride Safety Expertise and Experience of the Manufacturers.

As the State of Florida properly determined, acting well within the scope of its historic police powers, the manufacturers are best positioned to make determinations regarding the safety of the rides they design, develop, and build, often in multiple locations.

A fundamental fact about Volcano Bay is that its rides are enjoyed by thousands of guests per day and hundreds of thousands of guests per year. (Doc. No. 32 at p. 2.) As such, its rides are quite inherently designed for mass usage by guests of varying abilities and physical characteristics.[6] Universal may have only

---

[5]  *Quinones* is further distinguished from this case because Campbell can sue the party responsible for the alleged discriminatory condition, while the plaintiff in *Quinones* was unable to sue the State that had passed the state law of which he complained. *Quinones*, 58 F.3d at 277. *See Castelan v. Universal Studios Inc.*, No. CV 12-05481 (BRO) (AGRx), 2014 WL 210754, at *8 (C.D. Cal. Jan. 10, 2014) ("If Plaintiffs believe the restrictions are overprotective, they are free to initiate an action against the manufacturer."); *see also* authority cited in Footnote 8, *infa*.

[6]  Because there is no requirement to make the rides themselves accessible to persons with disabilities (see ADA Standards 1002, found at 36 C.F.R. pt. 1191,

one of each ride, while the manufacturer (ProSlide) here may have sold the same ride to multiple water park operators. Universal lacks the personnel, resources, medical expertise, or experience that would be needed to make such safety assessments. (*Id.* at p. 3.) The manufacturer here, on the other hand, has 35 years of experience designing *water rides* and ample expertise and experience doing so. (Doc. No. 28 at pp. 8-9; Doc. No. 39-1 at p. 3.) Of course, Universal is just one of many amusement park and water park operators in the State of Florida. Under these circumstances, it is reasonable and prudent for the State of Florida to assign safety decisions to the single manufacturer of every given ride, rather than have the multiple operators within the State making their own individualized and inevitably inconsistent decisions about the same or similar rides.

Moreover, as demonstrated by the Volcano Bay Riders' Guide and the Rider Eligibility Chart (Doc. Nos. 28-1 and 28-14), there are more than a dozen ways in which a Volcano Bay guest may have differing limbs and limb prosthetics, necessitating the need to make at least a dozen particularized safety determinations about the ability (or inability) of guests in each category to ride each ride. Putting aside for purposes of argument whether Universal (and each amusement park operator of all sizes) had the expertise and wherewithal to undertake this analysis, it

---

App. B and D), the rides themselves are necessarily designed for common use by all park guests.

is eminently reasonable for the State of Florida to decide that such determinations should be made by the ride manufacturers, who are constrained by ASTM Standards to do so in an appropriate way. *See*, *e.g.*, Doc. No. 30-1 at p. 23 (ASTM F2291-18, ¶¶ 5.1.1 ("The designer/engineer shall perform and document a ride analysis that illustrates how hazards to persons have been managed."), 5.1.1.4(1) ("A patron suitability assessment shall describe the suitability of the design of the amusement ride or device for the intended patrons, including anthropometric factors that relate age and physical size.")); *id.* at pp. 87-88 (ASTM F1193-18, ¶ 6.1 ("The manufacturer of an amusement ride or device shall provide … operating and maintenance instructions…. These instructions shall include …: [¶] 6.1.2.6 "… any recommended passenger limitations such as, but not limited to, height[,] passenger placement, *or any other appropriate restrictions*.") (emphasis added)); *id.* at p. 99 (ASTM F770-28, ¶ 5.3.1 ("Amusement ride or device operators should be given guidelines [by the ride designer] on the special considerations concerning patron size, and the special considerations applicable to physically disabled and mentally impaired patrons, related to the particular amusement ride or device.")).

This is precisely why the Florida Legislature created its regulatory scheme, delegating these safety determinations to the manufacturer and compelling operators to follow those determinations. Wherever the line is drawn on particular rider requirements, it is both inclusionary and exclusionary in that it necessarily includes

25

some who perhaps should not be riding and excludes some who may be able to do

so safely. But, importantly, it would be an undue hardship – indeed, a practical

impossibility – to require Universal (and all other amusement park operators in the

states that mandate ASTM Standards) to create an unknown number of varying rider

requirements for each ride depending on the assessed abilities of guests with varying

limb differences. Indeed, such inevitable inconsistencies between operators of the

same or similar rides would fuel further claims of discrimination, while the

application of a consistent, uniform standard strongly discourages such claims.

Accordingly, Florida's assignment of this critical safety task to the manufacturer is

reasonable and prudent and falls squarely within both the State's traditional police

powers and the powers that Congress itself believed would be exercised in these

circumstances.

    **C.**    **Florida's Creation of a *Uniform* System for Ensuring Amusement Ride Safety, Including the Ride Eligibility Requirements at Issue Here, Is Likewise "Necessary" to Public Safety.**

Based on this same predicate, a case can also be made for the closely-related,

but distinct, argument that, just as it is "necessary" for Universal (and other park

operators) to rely on the manufacturers' expertise and experience in coming up with

detailed rider requirements, it is likewise "necessary" for public safety for the State

of Florida to have a *uniform* system for setting manufacturer ride requirements.

As explained above, Universal and other park operators find it "necessary" to

rely on ride manufacturers' safety determinations. To create a uniform system of ride safety throughout the state (and through broad adoption of ASTM Standards, throughout most of the United States), it is "necessary" to assign the task of ride safety to one party and not a multiplicity of operators who will inevitably come up with a wide variety of differing requirements for individuals with different disabilities and for the same or similar rides at different parks. Uniformity itself has its own important value in protecting public health and safety and is "necessary" for the safe operation of these parks. This Court should not replace Florida's sound and reasonable judgments about public safety at amusement parks with its own. *Young*, 411 F. Supp. 2d at 1310 (noting that courts will generally not second-guess the public health and safety decisions of state legislatures, upholding safety law barring use of golf cart on public roads, despite disabled plaintiff's limited use of cart in safe situations); *Herriot*, 2009 WL 225418, at *4, 6 (upholding transfer of disabled resident from independent living apartment to a nursing facility based on state licensing laws).

Campbell's reliance on the decision in *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171 (3d Cir. 2019), is misplaced. In *Matheis*, the Court rejected the defendant's citation to a federal regulation that purports to give it discretion to determine the safety of blood plasma donors to justify its exclusion of the plaintiff's service animal from its donation center. *Id.* at 180. Unlike here, where Universal cites to Florida's

regulatory scheme, the regulation on which the plasma center defendant relied "does not give plasma donation centers *carte blanche* to ignore U.S. law, which not only mandates that service animals be allowed, 28 C.F.R. § 36.302(c), but also specifies when public accommodations may adopt rules that exclude disabled individuals in the name of safety, 28 C.F.R. 36.301." *Id.* Thus, in that case, the blood donation center was left to defend on safety grounds its own determination to exclude service animals, whereas here Universal relies on the sound and reasonable safety determination of the State of Florida, exercising its traditional discretion over public health and safety. *See also* U.S. Dep't of Justice, *Tech. Assistance Manual*, § III-3.8000.[7]

### D. The District Court And Two Of The Three District Courts That Previously Addressed This Same Issue Correctly Held That Amusement Park Operators Must Comply With Manufacturer's Ride Requirements; The Decision Of The Fourth District Court Can Be Reconciled.

Before the District Court ruled in this case, only three known cases had applied these well-understood principles of disability law – and its limits − to amusement park rider requirements, albeit outside of Florida. *Castelan v. Universal Studios Inc.*, No. CV 12-05481 BRO (AGRx), 2014 WL 210754 (C.D. Cal. Jan. 10,

---

[7]    Campbell's and the DOJ's other cases purporting to require Universal to conduct its own safety analysis are likewise distinguished as cases where the defendant was defending its own safety determination. *See, e.g., Baughmann v. Walt Disney World Co.*, 685 F.3d 1131, 1137 (9th Cir. 2012); *Leiken v. Squaw Valley Ski Corp.*, No. 2:93cv505, 1994 WL 494298, at *9 (E.D. Cal. June 28, 1994).

2014) (granting summary judgment to Universal because California law required it to follow the manufacturer's ride requirements); *Bench v. Six Flags Over Texas, Inc.*, 3:13-CV-705-P, 2014 WL 12586743 (N.D. Tex. July 7, 2014) (denying summary judgment to Six Flags); *Masci v. Six Flags Theme Parks, Inc.*, Civil Action No. 12-6585, 2014 WL 7409952 (D.N.J. Dec. 31, 2014) (denying summary judgment to Six Flags for those rides where it failed to prove the existence of manufacturers' requirements for the vast majority of rides). Although none of these decisions is binding on this Court or determinative of its consideration of this appeal, the courts' reasoning is persuasive.

The three decisions share much in common with each other and with the action below. As here, each of the cases involved plaintiffs with missing limbs whose absence was cited as a basis to exclude those plaintiffs from enjoying certain rides in amusements parks in California, Texas, and New Jersey. *Castelan*, 2014 WL 210754, at *2; *Bench*, 2014 WL 12586743, at *3; *Masci*, 2014 WL 7409952, at *4. All three states in question had passed laws that required the ride operators to follow the manufacturers' requirements, which ASTM also requires. *Castelan*, 2014 WL 210754, at *2; *Bench*, 2014 WL 12586743, at *6-7; *Masci*, 2014 WL 7409952, at *4. A brief discussion of some of their differences and how they have led to different results is illuminating.

29

In *Castelan*, plaintiffs abandoned on summary judgment any argument that Universal (or the Court) was required to disregard California law that, in turn, required operators to adopt the ride manufacturers' rider eligibility requirements. *Castelan*, 2014 WL 210754, at *4-5 (question limited to whether Universal was required to design rides for all riders). Notably, however, as an alternative basis for its ruling, the court held that it was "unwilling to require Defendants to second-guess the manufacturer's safety requirements … . It is not [Universal's] responsibility to challenge the manufacturer's operating manual, and ensure these requirements are in fact necessary for the safe operation of [the challenged ride]." *Id.* at *7. "For purposes of this motion, … the Court is satisfied that California law effectively requires Defendants to enforce the eligibility criteria of which Plaintiffs now complain." *Id.*[8]

---

[8]    If Campbell claims difficulty with the merits of ProSlide's safety requirements, his claims concern ProSlide (not Universal) as the "operator" of Volcano Bay's safety requirements. 42 U.S.C. § 12182(a) (making liable anyone who "owns, leases (or leases to) or operates a place of public accommodation"); *Castelan*, 2014 WL 210754, at *8 ("If Plaintiffs believe the restrictions are overprotective, they are free to initiate an action against the manufacturer.").

Although not an issue here, the *Castelan* court applied the longstanding definition and standard for determining whether a party "operates" a public accommodation announced by the Fifth Circuit soon after the ADA's passage in *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir. 1995) (finding franchisor could be an "operator" within the meaning of 42 U.S.C. § 12182(a) if it "specifically controls the modification of the franchisees to improve their accessibility to the disabled") (citing *Carparts Distrib. Ctr., Inc. v. Auto. Wholesalers' Ass'n*, 37 F.3d 12, 16-18 (1st Cir. 1994)), to "look to defendant's control over allegedly discriminatory denial

In both *Bench* and *Masci*, Six Flags had undergone a system-wide tightening of rider eligibility requirements after one manufacturer issued a service bulletin changing rider requirements and after conducting a company-wide audit reviewing all of these requirements. *Bench*, 2014 WL 12586743, at *2; *Masci*, 2014 WL 7409952, at *2. Notably, unlike *Castelan* or this action, the vast majority of Six Flags' tightened restrictions were not based on the manufacturer's restrictions required by state law and also imposed uniform requirements without attention to particular rides and their differences. *Bench*, 2014 WL 12586743, at *6 ("Six Flags Over Texas has provided evidence that only one of its rides . . . comes with a manufacturer recommendation…."), at *9 (reporting only generally on amusement park industry, not rides at Six Flags over Texas); *Masci*, 2014 WL 7409952, at *10

---

of employee benefits." *See also Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 849 (9th Cir. 2004); *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002). Multiple courts have since applied *Neff* to identify as potentially liable "operators" that control the discriminatory condition at issue, even if they do not entirely control the place of public accommodation. *Tatum v. Nat'l Collegiate Athletic Ass'n*, 992 F. Supp. 1114, 1121 (E.D. Mo. 1998) (challenging NCAA's refusal to recognize ACT results taken by a learning disabled applicant/athlete, NCAA may be liable as "operator" because it exerted a "significant degree of control" over its member institutions' athletic facilities); *Mullen v. S. Denver Rehab., LLC*, Civil Action No. 18-cv-01552-MEH, 2020 WL 2557501, at *8 (D. Colo. May 20, 2020); *Bailey v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*, 484 F. Supp. 3d 346, 373 (E.D. La. 2020), *aff'd sub nom Bailey v. France*, 852 Fed. App'x 852 (5th Cir. 2021); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 486-487 & 515 (D.N.J. 1998) (special education student lacked certain academic course prerequisites and NCAA may be liable as operator that "manages, controls or regulates the allegedly discriminatory conditions of that place or those places of public accommodation.").

(Six Flags' argument that New Jersey law required it to implement manufacturer rider requirements fails because it "has only provided evidence that the manufacturer had changed the ridership requirements for five of its high-thrill rides. … For all of the other rides at Six Flags …, this argument is unsupported by evidence and therefore inapplicable."), *11 (applying uniform restrictions for *all* rides).  Unlike either of those cases, ProSlide's express rider eligibility requirements bar Plaintiff from riding any of the Volcano Bay rides or slides.  (Doc. No. 30-1 at p. 6.)

Notably, despite denying summary judgment for the incomplete factual record, the *Masci* court favorably cited the reasoning in *Castelan*, holding:

> Six Flags can reasonably rely upon the ridership restrictions created by the ride experts – the manufacturers.  It is only logical that the ride manufacturers, as the manufacturer of the ride, are in the best position to determine what ridership requirements are warranted and necessary to make the ride safe for all guests. ...
>
> Likewise, the Court does not believe that the ADA places additional requirements on Six Flags to reevaluate the ridership requirements to find out if they are, in fact, necessary.  Rather, the ridership requirements of the manufacturer establish certain safety requirements that have been found necessary for the safe operation of the rides.  … If these requirements work to exclude [plaintiff] from certain rides due to his disability, Six Flags has satisfied their burden in demonstrating that such exclusion from the rides it has provided the service bulletins for does not violate the ADA.

*Masci*, 2014 WL 7409952, at *10.  Thus, before the District Court issued the decision now under review, two of the three district courts that addressed the central

issue in this action held that an amusement park operator can rely on the manufacturer's rider requirements.

The *Bench* decision, in contrast, adopts a contrary view, shifting the burden of nullifying safety requirements on the ride operator, remarkably asserting without citation to authority that "[i]f [Six Flags is] concerned about compliance with state law, the appropriate method is to file a suit to be released from their state law obligations… ." *Bench*, 2014 WL 12586743, at *8. Based on the plentiful authority cited above, Universal respectfully submits that the ADA does not require a place of public accommodation to bear the burden of challenging state safety statutes to comply with the ADA, particularly where, as here, the ADA contemplated the existence of such state and local law.[9]  Indeed, the DOJ's published guidance makes

---

[9]    The *Bench* court also incorrectly asserted that ASTM does not require a ride operator to follow the manufacturer's requirements, a position that Campbell nowhere asserts. *Bench*, 2014 WL 12586743, at *9 n.14. (*Cf.* Doc. No. 30-1 at p. 8.) Even though the *Bench* court stands alone among the three cases on this question and also contradicts the undisputed testimony of career-long ASTM expert Brian King, it merely held that the record on the question was not "fully developed." *Id.*, at *9 n.14.  Here, the undisputed expert report fully develops the record on the interpretation of ASTM. (Doc. No. 30-1 at p. 8.)  Moreover, the *Bench* court encouraged in its ruling the further "development" of former ASTM F770-11 Standard 4/1, which provided that the ride owner/operator "shall read and become familiar with" the manufacturer's "recommended operation instructions and specifications, when received."  Whatever its meaning at the time *Bench* was decided, that 2011 ASTM provision has been revised and supplemented in a way that makes clear, as concluded in the undisputed expert report, that it "requires Universal to incorporate ProSlide's recommendations in preparation of policies and

clear that public accommodations can rely on public health authorities, such as the state.  U.S. Dept. of Justice, Tech. Assistance Manual § III-3.8000.[10]

## II.  THE DISTRICT COURT PROPERLY FOUND THAT THE ADA DOES NOT PREEMPT FLORIDA LAW THAT MANDATES AMUSEMENT RIDE SAFETY STANDARDS.

Campbell contends that applicable Florida law in this case is preempted by, and must give way to, the ADA.  However, as the District Court found, the facts and well-settled case law governing preemption do not support Campbell's position.

This Court has consistently analyzed the three potential grounds for preemption of state law: "(1) express preemption; (2) field preemption; and (3) conflict preemption."  *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1094 (11th

_____

procedures to operate their rides safely and in preparation of its Guide for Rider Safety and Accessibility."  (Doc. No. 30-1 at p. 8.)

[10]    A fallacious premise of Campbell's argument here is that rider eligibility requirements can be established with such precision that all persons with disabilities could be described by their physical attributes (limb differences here) in a way that would permit a clear inclusion of all those who could safely ride the attractions, while excluding those who could not safely ride.  This cannot be true.  Any uniform standard applied over literally millions of amusement park guests, like the rider eligibility requirements or even the entirety of the ADA Standards for Accessible Design, will necessarily be both unduly broad and unduly narrow in excluding some who can safely ride and including some who cannot.  Even basic "building block" ADA requirements like slope requirements will necessarily permit some people using wheelchairs to traverse the slope required by the ADA Standards, while excluding others who have more severe disabilities.  This is important to recognize because no system of public health or safety, including the ADA Standards themselves, will not have some unintended exclusionary impact.

Cir. 2021) (citing *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167

(11th Cir. 2008)).  This appeal presents an issue of conflict preemption.

> Conflict preemption occurs "where (1) 'compliance with both federal
> and state regulations is a physical impossibility,' or (2) 'the challenged
> state law stands as an obstacle to the accomplishment and execution of
> the full purposes and objectives of Congress.'"

*Id.* (citing *Browning*, 522 F.3d at 1167).  A party asserting conflict preemption "faces

a high bar."  *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir.

2017).  The U.S. Supreme Court has held that "'a high threshold must be met if a

state law is to be preempted for conflicting with the purposes of a federal Act.'"

*Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted).  Further,

"[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into

whether a state statute is in tension with federal objectives.'"  *Id.* (citation omitted).

Based on Supreme Court precedent, this Court applies two principles in

analyzing potential preemption.  "First, 'the purpose of Congress is the ultimate

touchstone in every pre-emption case.'"  *Marrache*, 17 F.4th at 1094 (citing *Wyeth*

*v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

485 (1996))).  "Second, we assume that 'the historic police powers of the States [are]

not to be superseded by the Federal Act unless that was the clear and manifest

purpose of Congress.'"  *Id.* (citations omitted); *see Wyeth*, 555 U.S. at 565; *Lohr*,

518 U.S. at 485; *see also Parise v. Delta Airlines, Inc.*, 141 F.3d 1463, 1465 (11th

35

Cir. 1998) ("[C]ourts should not lightly infer preemption of actions within the traditional police powers of a state." (citations omitted)).

The Supreme Court's longstanding preemption jurisprudence recognizes that state regulation enjoys "historic primacy" when it comes to "matters of health and safety." *Lohr*, 518 U.S. at 485. The "'States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Id.* at 475 (citation omitted). Similarly, this Court has noted that "State governments retain their historic police powers to protect public health." *Graham*, 857 F.3d at 1190 (citing the Tenth Amendment to the U.S. Constitution).

The Florida regulatory scheme at issue in this case (as laid out in Argument Section I.A.1, *supra*) is clearly designed to promote and protect public health, well within the State's traditional police powers. Section 616.242 and its implementing Rule 5J-18.0011, *F.A.C.*, which adopted the ASTM Standards, furthered the State's interest in "public health, safety, and welfare," and advanced its stated objective "to promote patron safety in the design, construction, assembly, disassembly, maintenance, and operation of amusement rides in this state." Fla. Stat. § 616.242(4)(b).

In its 1998 amendments to Section 616.242, moreover, the Florida Legislature expressed particular concern about the safety of amusement rides at water parks:

> The Legislature finds that … amusement rides at water parks … are amusement rides that, because of their unique nature, pose safety risks to patrons distinct from other amusement rides.  Therefore, the department shall adopt rules regulating their safe use and operation and establish safety standards and inspection requirements in addition to those required by this section or other department rule.

Fla. Stat. § 616.242(4)(c).  Based on Section 616.242(4)(c), the Department adopted Rule 5J-18.016, *F.A.C.*, which established "specific requirements for water related amusement rides in addition to the general requirements" applicable to amusement rides.  Fla. Admin. Code R. 5J-18.016(1).  Rule 5J-18.016 expressly requires an owner/operator of a water ride to adhere to manufacturer requirements.  The mandates contained in Rule 5J-18.016 represent a policy decision by the State to rely upon the manufacturer's experience with its rides in providing safety-based instructions to the owner/operator.

The District Court properly found that the ADA does not preempt this statutory and regulatory framework.  In short, there is no conflict between Florida law under Section 616.242 and the ADA.  As demonstrated in Argument Section I, *supra*, Universal's adherence to the eligibility criteria established by ProSlide is "necessary" and fully consistent with ADA requirements.  Applicable state law and the ADA are in harmony, not in conflict.

In arguing that the ADA preempts state law in this case, Campbell does not invoke the form of conflict preemption where compliance with both federal and state law is a "physical impossibility."  "Impossibility pre-emption is a demanding

defense" (*Wyeth*, 555 U.S. at 573), and there is no reason to suggest that Universal is unable to comply with both Florida's mandate to follow a manufacturer's safety-based requirements and the ADA's mandate to eliminate discrimination against persons with disabilities. *See Marrache*, 17 F.4th at 1095 (Defendants failed to show how compliance with federal law and state law "would be a physical impossibility").

Instead, Campbell asserts conflict preemption on the alternative ground that "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1094. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). The Supreme Court has held that "[i]f the purpose of the act cannot otherwise be accomplished – if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect – the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (citation omitted).

However, "[a]bsent clear congressional intent to the contrary, federal preemption of state law is not favored, … especially in areas of law traditionally occupied by the states." *Marsh v. Rosenbloom*, 499 F.3d 165, 177-78 (2d Cir. 2007). In such instances, this Court has cautioned that "the conflict between state law and

federal policy must be a 'sharp' one." *Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1132 n.5 (11th Cir. 2020) (citing *Marsh*, 499 F.3d at 178).

In this case, Congress's stated purpose in enacting the ADA was to, among other things, "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and to "provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1) & (2). By contrast, in Section 616.242, *Florida Statutes* ("Safety Standards for Amusement Rides"), the Florida Legislature sought to "promote patron safety in the design, construction, assembly, disassembly, maintenance, and operation of amusement rides in this state." Fla. Stat. § 616.242(4)(b). In addition, the Legislature expressly found that amusement rides at water parks, "because of their unique nature, pose safety risks to patrons distinct from other amusement rides." Fla. Stat. § 616.242(4)(c). Therefore, the Legislature directed the Department to adopt rules regulating their "safe use and operation" and establish additional safety standards. *Id.* The rules adopted by the Department included Rule 5J-18.016, *F.A.C.* ("Regulation of Water Parks"), which requires operators like Universal to follow manufacturer requirements. In this particular case, the requirements of the manufacturer mandate that patrons be able to maintain the proper riding position on each ride or slide, which, in turn, requires

riders to have two functioning hands or two natural arms that terminate below the elbow.

Nothing in this statutory and regulatory scheme creates a necessary or inherent conflict between the ADA's mandates and state law governing safety standards for amusement rides at water parks. In exercising its police powers for the protection of public safety, the State of Florida chose to defer to manufacturer requirements because, as the District Court found in its summary judgment Order, the manufacturer is naturally in the "best position" to determine the safe operation of its rides. (Doc. No. 66 at p. 9 (citing *Masci*, 2014 WL 7409952 at *10).) Florida law in this area does not implicate or impair federal policy underlying the ADA.

Further, on a fundamental level, the ADA and Section 616.242 "serve different purposes," thereby militating against any conflict. *See Marsh*, 499 F.3d at 180 ("On a fundamental level, the CERCLA statute of limitations and Delaware's corporate wind-up period serve different purposes, reinforcing our conclusion that they do not actually conflict"). On their face, the ADA and Section 616.242 were enacted for different reasons and they address distinct legislative mandates.

Even in instances where federal and state law address the same subject matter, but take diverse paths, this Court has refused to find conflict preemption. In *Marrache*, this Court reviewed a district court's finding that the Food Additives Amendment of 1958 (which amended the Federal Food, Drug, and Cosmetic Act)

40

preempted Section 562.455, *Florida Statutes*. Pursuant to the Food Additives Amendment, the Food and Drug Administration ("FDA") expressly identified grains of paradise as a substance "generally recognized as safe" ("GRAS"), thereby permitting grains of paradise to be included in alcohol. However, Section 562.455, *Florida Statutes* (enacted in 1868), banned the inclusion of grains of paradise in alcohol sold in Florida. This Court found that Section 562.455 was <u>not</u> preempted by the Food Additives Amendment and its implementing regulations, because "no conflict exists between federal and state law":

> Congress's purpose in enacting the Food Additives Amendment – as derived from the statutory text – was to prohibit unsafe food additives from being included in food and alcohol to protect the health and safety of the public. Section 562.455, which bans the adulteration of alcohol with grains of paradise, does not frustrate that purpose, even if the FDA has determined that grains of paradise is GRAS.

*Marrache*, 17 F.4th 1097; *see also id.* at 1095 ("[T]he fact that grains of paradise can be included in alcohol under federal law does not mean that federal law mandates individual states to allow the sale of alcohol containing grains of paradise").

Similarly, as the District Court explained in this case, the ADA and applicable Florida law under Section 616.242 are entirely consistent. In its summary judgment Order, the District Court began its analysis by noting that "[t]he necessary eligibility criteria defense established by 42 U.S.C. § 12182(b)(2)(A)(i) explicitly contemplates restrictions on disabled individuals' access to places of public accommodation when such screening is essential for safety reasons, such as amusement rides." (Doc. No.

41

66 at p. 6 (citing the examples in 28 C.F.R. § 36.301(b) of "safety qualifications that would be justifiable in appropriate circumstances," including "height requirements for certain amusement park rides").)    After describing Florida's statutory and regulatory scheme for ensuring amusement ride safety, the District Court held that the ADA "does not preempt the Florida law and its accompanying regulations," explaining:

> There is no evidence from the text of 42 U.S.C. § 12182(b)(2)(A)(i), specifically, or the structure of Title III, generally, that Congress meant to oust the Florida Legislature from the entire legislative field, including, as is relevant here, the regulation of patron health and safety in the amusement park setting.  To the contrary, Congress expressly anticipated the need for and exempted necessary eligibility criteria, and the Department of Justice recognized that such justifiable restrictions exist in the amusement ride context, a unique and inherently risk-laden form of entertainment.  Far from standing as an obstacle to Congress' purpose of eliminating disability discrimination in places of public accommodation, the Florida regulations fit within the federal statutory scheme by using the state's historic police powers to institute a "floor" of neutral ridership eligibility criteria that the Florida Legislature deems necessary for the safe operation of amusement rides.

(*Id.* at p. 8.)

The District Court further held that the ADA does not require Universal to "reevaluate ProSlide's ridership eligibility criteria to decide whether they are, in fact, necessary."  (*Id.* at p. 9.)  Instead, "Florida law, by adopting the ASTM's safety standards, considers ProSlide's ridership eligibility criteria necessary for the safe operation of the Contested Attractions." (*Id.*)  Therefore, the District Court properly

concluded that Universal's "compliance with ProSlide's ridership eligibility criteria under Florida law satisfies its burden to demonstrate that those criteria are necessary" for the safe operation of the subject rides. (*Id.* at pp. 9-10.)

Both Campbell and *Amicus Curiae* the DOJ flatly ignore the foregoing analysis in arguing that the District Court allowed Universal to rely on state law to "excuse noncompliance" with the ADA. (I.B. at p. 31; DOJ at pp. 12-13.) The opposite is true: the District Court expressly found that Universal complied with the ADA by applying the ridership eligibility criteria that Florida law deems necessary for the safe operation of the rides at Volcano Bay. In a similar way, the DOJ's argument that the District Court "must first consider whether Universal's ban on one-limbed riders actually qualifies as 'necessary' under the ADA and its implementing regulations," (DOJ at p. 14) is simply misplaced. The District Court in fact made that determination as part of its decision, and it certainly did not, as the DOJ suggests, "simply assume that a state law requiring the exclusions supersedes the ADA." (*Id.*)

The various Courts of Appeals decisions cited by Campbell on pages 30-32 of his Initial Brief fail to support his position. None of those cases involved the application of facts and law even remotely resembling those in this case, and most

of those cases were decided on grounds other than preemption.[11]    Tellingly, Campbell cites no decisions by this Court holding that the ADA preempted a conflicting state law.   Campbell also did not address any decisions by this Court, including in *Marrache*, which found that a state statute was not preempted by federal law.

Instead, Campbell argues that the District Court's analysis in this case is "identical" to the summary judgment that the Ninth Circuit reversed in *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996).  (I.B. at p. 32.)  However, the central issue in *Crowder* was whether the plaintiffs' proposed alternatives to Hawaii's quarantine for guide dogs constituted "reasonable modifications" under the ADA that should be implemented, or "fundamental alterations" that could be rejected by the state.  *Id.* at 1485.  The Ninth Circuit noted that "[t]he linchpin of the district court's summary judgment on the ADA claim, and the state's argument, is that '[t]he quarantine requirement is a public health measure, and not a 'service' or benefit furnished by the state to eligible participants.'"  *Id.* at 1483 (citation omitted).  The Ninth Circuit held that the district court's analysis improperly assumed that "no violation of the ADA occurs unless a service or benefit of the state is provided in a manner that discriminates against disabled individuals."  *Id.*  The ruling in *Crowder* regarding

---

[11]    For example, in *Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1232 (10th Cir. 2009), the Tenth Circuit held that "[t]he Supremacy Clause does not govern the outcome of this case."

"reasonable modifications" required by the ADA has no application to the summary judgment that the District Court rendered in this case.

Campbell compounds his mistaken analysis of *Crowder* by next asserting that in this case, the State of Florida "did not even thoroughly considered [sic] the issue, it just meekly deferred to industry standards which referred to the manufacturer's requirements." (I.B. at p. 33.) No record evidence in this case indicates that Florida did not thoroughly consider the issue of amusement ride safety in enacting Section 616.242 and its implementing regulations or that the State "meekly deferred" to industry standards. Likewise, Campbell's argument that the ADA "'trumps' the needs of the operators of amusement park rides to influence state regulators to defer to their needs or desires," is factually unfounded and flatly ignores the sound legislative purposes of Section 616.242. *Id.*

Thus, Campbell has failed to meet the "high threshold" required to establish the ADA's preemption of Florida law in this case. *Whiting*, 563 U.S. at 607. The District Court correctly found that the ADA did not preempt the State's exercise of its historic police powers in enacting the amusement ride safety requirements that apply to the water rides at Universal's Volcano Bay.[12]

---

[12]    Even if the ADA, as a federal law, preempts the Florida statute, Campbell's FCRA claim cannot prevail because Universal cannot be said to violate one Florida statute (here, the FCRA) by the very act of complying with another Florida law, let alone a later-enacted Florida law. *Howarth v. City of De Land*, 117 Fla. 692, 701,

## **CONCLUSION**

For the reasons set forth above, this Court should affirm the District Court's

entry of a summary judgment in Universal's favor.

Respectfully submitted this 23rd day of September, 2022.

/s/ *Michael J. Beaudine*
**Michael J. Beaudine, Esq.**
Florida Bar No. 0772763
beaudine@lathamluna.com
LATHAM, LUNA, EDEN & BEAUDINE, LLP
201 S. Orange Avenue, Suite 1400
Orlando, FL 32801
Telephone:  407-481-5800
Facsimile:  407-481-5801

/s/ *David Raizman*
**David Raizman, Esq.**
California Bar No. 129407
david.raizman@ogletree.com
400 South Hope Street, Twelfth Floor
Los Angeles, California 90071
Telephone:  213-239-9800
Facsimile:  213-239-9045

*Attorneys for Appellee, Universal City Development Partners, Ltd.*

---

158 So. 294, 298 (1934) ("The courts, in construing a statute, must, if possible, avoid such construction as will place a particular statute in conflict with other apparently effective statutes covering the same general field.  Acts *in pari materia* should be construed together.  And where the courts can, in construing two statutes, preserve the force of both without destroying their evident intent, it is their duty to do so.") (internal citations omitted)).  As a result, even should this Court find that the ADA preempts Florida law, Campbell's FCRA claim cannot be saved by preemption, and this Court should affirm summary judgment on that claim.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,846 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Size 14 Times New Roman font.

Dated: September 23, 2022.

/s/ *Michael J. Beaudine*
**Michael J. Beaudine, Esq.**
Florida Bar No. 0772763
beaudine@lathamluna.com
LATHAM, LUNA, EDEN & BEAUDINE, LLP
201 South Orange Avenue, Suite 1400
Orlando, Florida 32801
Telephone:  407-481-5800
Facsimile:  407-481-5801

**David Raizman, Esq.**
California Bar No. 129407
david.raizman@ogletree.com
400 South Hope Street, Twelfth Floor
Los Angeles, California 90071
Telephone:  213-239-9800
Facsimile:  213-239-9045

*Attorneys for Appellee, Universal City Development Partners, Ltd.*

47

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 23, 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will give notice of electronic filing to all counsel of record.

I HEREBY FURTHER CERTIFY that on September 23, 2022, four (4) copies of the foregoing were dispatched to the Clerk of the Court via FedEx for delivery to the Clerk within 3 days.

/s/ *Michael J. Beaudine*
**Michael J. Beaudine, Esq.**